Lisa R. Petersen (7598)
Stephen T. Hester (9981)
Jessie E. Dyer (17660)
COHNE KINGHORN, P.C.
111 East Broadway, 11th Floor
Salt Lake City, Utah 84111
Telephone: (801) 363-4300
Facsimile: (801) 363-4378
Email: lpetersen@ck.law
          shester@ck.law
          jdyer@ck.law

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| JON CHARLES OBERG, an individual, <br><br> *Plaintiff,* <br><br> v. <br><br> TANNER MEMORIAL CLINIC, a Utah corporation, <br><br> *Defendant.* | **COMPLAINT** <br><br> Case No. 1:26-cv-95 <br><br> Judge: _____ <br><br> **JURY DEMAND** |

Plaintiff Jon Charles Oberg, M.D. ("Dr. Oberg" or "Plaintiff"), by and through counsel, hereby complains and alleges against defendant Tanner Memorial Clinic ("Tanner" or "Defendant") as follows:

## NATURE OF CASE

1. This action arises out of Tanner's unlawful treatment of Dr. Oberg during his employment with Tanner, including age discrimination, retaliation, and Tanner's breach of its contractual duties owed to Dr. Oberg.

2. Dr. Oberg enjoyed working at Tanner for over thirteen years and got along well with his partners during that time. Pursuant to his employment contract, Dr. Oberg would have received additional benefits if he had retired from Tanner after the age of sixty-five. Even though Dr. Oberg did not plan to retire at age sixty-five, when he approached that age, Tanner began treating him negatively. Dr. Oberg's skill as a medical professional had not wavered in the slightest, as evidenced by statements made by members of Tanner's administration. Moreover, despite there being no capacity in Tanner's schedule to add additional physicians, Tanner hired two new surgeons, both under the age of forty. To make space for these new surgeons, Tanner began withholding opportunities from Dr. Oberg, leaving him unable to cover his overhead costs or earn a living. In response to Dr. Oberg's concerns that he was being discriminated against on the basis of his age, Tanner did nothing. Instead, Dr. Oberg was encouraged to "retire." Because of the immense pressure and negative treatment that Tanner placed on Dr. Oberg, he was left with no choice but to terminate his employment with Tanner at the age of sixty-four.

3. Through this action, Dr. Oberg seeks damages and other relief arising from Tanner's unlawful conduct in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, and Tanner's breach of its contractual obligations.

**PARTIES**

4.      Dr. Oberg is an individual who, at all relevant times, has resided in Davis County, Utah. Dr. Oberg was employed by Tanner from August 2011 until June of 2025, in Tanner's General Surgery Department (the "Department").

5.      Tanner is a Utah corporation that is located in Davis County, Utah. Its principal address is 2121 North 1700 West, Layton, UT, 84041.

**JURISDICTION AND VENUE**

6.      This Court has federal question jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and 29 U.S.C. § 621, *et seq.*

7.      The Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's claims for breach of contract, and breach of the implied covenant of good faith and fair dealing.

8.      The Court has personal jurisdiction over Defendant because Defendant is incorporated in Utah or its contacts with Utah gave rise to Plaintiff's claims.

9.      Venue in this Court is proper under 28 U.S.C. § 1391(b) because a substantial part of the acts or omissions giving rise to the claims alleged herein occurred within this judicial district, and Defendant is subject to personal jurisdiction here.

10.      On or about March 13, 2025, Dr. Oberg filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") complaining of acts of discrimination, retaliation, and constructive discharge described herein.

11.      The EEOC issued a Notice of Right to Sue dated March 26, 2026. Accordingly, all administrative requirements for filing Dr. Oberg's discrimination and retaliation claims have been met.

4938-3011-7047, v. 1

### GENERAL ALLEGATIONS

**A. General Background.**

12. Tanner is a Utah corporation organized to conduct the practice of medicine through physicians licensed in the State of Utah.

13. Tanner is an entity with more than twenty (20) employees for each working day in each of twenty (20) or more calendar weeks in the calendar year.

14. Dr. Oberg is a general surgeon with over thirty (30) years of experience.

15. During the relevant time frame, Dr. Oberg was over forty (40) years old.

16. In August of 2011, Dr. Oberg joined Tanner. For thirteen years of practice at Tanner, Dr. Oberg enjoyed working with his partners in the Department. His relationship with his partners was amicable and productive during this time.

17. Dr. Oberg's employment with Tanner was memorialized pursuant to that certain "Shareholder Physician Employment Agreement" (the "Agreement"). A true and correct copy of the Agreement is attached hereto as Exhibit "A."

18. The Agreement provides that Dr. Oberg's "practice of medicine shall be conducted primarily through the office or offices comprising the [Tanner's] facilities; provided, however, that in-patient care shall be delivered at such hospital facilities and such other locations as may be consistent with the demands of appropriate patient care."

19. In the event of termination, the Agreement includes a provision for "Maintenance of Coverage" which states that "[t]he cost of any 'tail' or 'prior act' coverage required hereunder shall be borne by the Employee."

20. There is, however, an exception to this "Maintenance of Coverage" provision, stating that, in the event the Agreement is "terminated for . . . retirement after age 65, the cost of

4

any 'tail' or 'prior acts' coverage required hereunder" would be required to "be borne by [Tanner] and not the Employee."

21. The rights and obligations of Dr. Oberg were "subject to the terms and conditions of [Tanner's] Articles of incorporation, Bylaws, Shareholders' Agreement and other agreements governing [Tanner] and its shareholders."

22. A primary method by which Dr. Oberg received compensation at Tanner was through participating in the Department's "call schedule."

23. Participating in the "call schedule" entailed being "on call" at various hospitals to treat patients.

24. Pursuant to the Agreement, Tanner's Board of Directors (the "Board") had "ultimate authority over [Dr. Oberg's] schedule and duties" and had "ultimate authority to approve or modify [Dr. Oberg's] office hours and work schedule."

**B. Davis Hospital Investigation.**

25. In June of 2023, complaints were made regarding Dr. Oberg's care of two patients at Davis Holy Cross Hospital ("Davis").These complaints resulted in a temporary suspension of Dr. Oberg's privileges at Davis in October of 2023 while Davis investigated the complaints (the "Investigation").

26. The temporary suspension of Dr. Oberg's privileges at Davis interfered with Dr. Oberg's ability to participate in the Department call schedule.

27. Despite his inability to participate in the call schedule, Tanner and the Department were supportive of Dr. Oberg in his efforts to resolve the Investigation.

28. Indeed, in a letter dated August 30, 2023, addressed to the CEO of Davis, the Department and Tanner administration stated that they "believe that [Dr. Oberg] has provided

4938-3011-7047, v. 1

quality care at the hospital, is a valued partner in the department, and his involvement in call coverage is critical in moving forward."

29. At our about this same time, Marshall McKinnon, the CEO of Tanner, reached out directly to Dr. Oberg to tell him that Tanner's August 30th letter was intended to convey the Department's "unified support" of Dr. Oberg.

30. In November 2023, Dr. Oberg was also informed by the Department that resolving the complaints with Davis Hospital would result in the full restoration of his job duties and that he would be able to resume his position on the call schedule.

31. Unfortunately, in direct contradiction of Tanner's and the Department's express support of Dr. Oberg during the Investigation, and with the knowledge that Dr. Oberg was working with Davis to resolve the Investigation, fully restore his privileges at Davis and resume his position on the call schedule, Tanner and the Department's treatment of Dr. Oberg suddenly changed.

**C. Tanner's Efforts to Force Dr. Oberg to Retire Early Correspond with Hiring Two New, Younger Surgeons.**

32. Beginning in January 2024, Tanner and the Department's treatment of Dr. Oberg abruptly changed.

33. One of the first signs of this abrupt change was Tanner's out of the blue request that Dr. Oberg relocate his office to a location away from his partners.

34. Although Dr. Oberg's office had been in the same location for the past thirteen years, Tanner told Dr. Oberg that this move was necessary because his relationships with his partners were allegedly strained and had not improved over the previous six months.

6

35.     Dr. Oberg was surprised by Tanner's statement because he was not aware that any of his relationships with his partners were strained in any way, particularly given his partner's expressed support of him over the previous six months.

36.     At or around this same time, and in conjunction with moving his office location, Tanner also told Dr. Oberg that his share of referrals from Tanner would be reduced by 50%. Tanner failed to provide any explanation for this sudden reduction in his share of referrals.

37.     Dr. Oberg did not want to change his office location and have his clinic referrals involuntarily reduced by 50% because these changes would significantly reduce his income. However, Dr. Oberg acquiesced to these changes because he believed they were temporary and would be reversed upon resolving the Investigation consistent with Tanner's and the Department's prior representations.

38.     At or about that same time, Tanner and the Department hired two new partners, both of whom were under forty (40) years old: Dr. Joshua Morrell and Dr. Kirstie Jarrett.

39.     Despite Tanner's reassurances that Dr. Oberg would be able to resume his role on the call schedule, Dr. Oberg expressed concerns about these additions to Tanner because there is a limited amount of space in the Department and on the call schedule.

40.     This limited amount of space meant that two other surgeons would need to relinquish their spots on the call schedule to make room for Drs. Morrell and Jarrett.

41.     At the time, Dr. Oberg understood that Dr. Morrell's father, Glen Morrell, MD, was nearing retirement and had volunteered to be removed from the call schedule. Dr. Oberg understood that Dr. Morrell was hired to replace his father in the Department and on the call schedule. Accordingly, Dr. Oberg supported hiring Dr. Joshua Morrell.

7

42.     However, it was unclear to Dr. Oberg whether there were any other surgeons that intended to voluntarily relinquish their spot on the call schedule to accommodate Dr. Jarrett.

43.     What Dr. Oberg did know was that he had no intention of retiring or giving up his position on the call schedule, particularly given the Department's prior assurances that as soon as the Investigation was resolved, he would resume all of his job duties and position on the call schedule.

44.     Dr. Jarrett is a general surgeon who performs many of the same surgeries as Dr. Oberg. If Tanner were to hire Dr. Jarrett, not only would she need a place on the call schedule, but she would also need office space and referrals to build her practice as a surgeon.

45.     Thus, Dr. Oberg objected to hiring Dr. Jarrett because that would require that another, unidentified surgeon—p erhaps himself—w ould need to relinquish their position in the Department and on the call schedule.

46.     Notably, Dr. Jarrett was hired around January 2024, the same month Dr. Oberg was asked to change his office location.

47.     In May 2024, Dr. Oberg reached an agreement in principle with Davis to resolve the Investigation. This agreement would result in the full reinstatement of Dr. Oberg's privileges at Davis, allowing Dr. Oberg to resume his position on the call schedule.

48.     In anticipation of the full reinstatement of his privileges at Davis, Dr. Oberg reached out to the Department with the good news and requested that he resume his position on the call schedule as soon as his privileges were reinstated.

49.     In response, Dr. Oberg was told that the schedule had already been set through September 2024, and it was too late to make any changes.

50. At the time, Dr. Oberg was led to believe that the only reason he was not placed on the schedule was that it had already been set.

51. Later, Dr. Oberg became aware that Dr. Jarrett had been added to the call schedule in June of 2024, despite the fact that he was told in May that it was impossible to add him to the schedule because it had already been set.

52. In early September 2024, Dr. Oberg fully resolved the Investigation, and his privileges were fully restored at Davis, allowing Dr. Oberg to resume all of his job duties and his position on the call schedule consistent with the Department's prior representations.

53. Eager to resume his regular job duties and his position on the call schedule, Dr. Oberg reached out to the Department about being placed on the call schedule in October 2024.

54. Unfortunately, Tanner and the Department ignored Dr. Oberg's repeated requests to resume his position on the call schedule.

55. Dr. Oberg inquired whether any additional steps were needed to place him on the call schedule, as he was ready, willing, and able to do whatever was necessary to resume his practice fully.

56. No one from Tanner reached out to Dr. Oberg or responded to his inquiries.

57. Dr. Oberg was left trying to understand why Tanner and the Department were essentially ending his career with Tanner.

58. After requesting a meeting with Tanner administration to gain an understanding of his position in the clinic, Dr. Oberg met with Tanner administration in November 2024.

59. During this meeting, members of Tanner's administration, including McKinnon, told Dr. Oberg that his partners had decided they no longer wanted to put him on the call

4938-3011-7047, v. 1

schedule because of "continued issues with interactions" between Dr. Oberg and his partners, and they no longer trusted him.

60.     Dr. Oberg was shocked and confused by this response because he had not had any interactions with his partners since they had taken him off the call schedule and required him to change his  office to a remote location, isolating him from the rest of the Department.

61.     Dr. Oberg asked for examples of complaints by his partners that led them to no longer trust him so that he could attempt to address them, but none were ever provided.

62.     During that November meeting, Dr. Oberg again requested assistance from Tanner and its Board with being placed on the call schedule.

63.     Dr. Oberg was told that the Board could not assist with the schedule and that the Department had the ultimate say on whether he could participate in the call schedule. This statement is directly contradicted by terms of the Agreement, providing that the Board has "ultimate authority" over Dr. Oberg's schedule and duties.

64.     During this same meeting, Dr. Oberg expressed concern that the decisions to make him change office location, reduce his clinic referrals by 50% and deny him the opportunity to resume his place on the call schedule were eroding his ability to continue his practice with Tanner.

65.     Dr. Oberg further expressed his concern that Tanner was, in effect, forcing him into early retirement, and that the decisions to restrict his ability to practice were discriminatory and improperly based on his age.

66.     Dr. Oberg's concerns were dismissed, and he was encouraged by Tanner to just "retire."

4938-3011-7047, v. 1

67. Instead of assisting Dr. Oberg by escalating his concerns of discrimination to Tanner's Board and providing him any semblance of due process as required by the Agreement, the administration told Dr. Oberg that the Department could terminate his employment at any time.

68. Dr. Oberg understood this as an unmistakable threat that further complaints of discrimination would result in his termination.

69. By limiting Dr. Oberg's patient referrals and denying his participation on the call schedule, Dr. Oberg was not able to meet his overhead obligations to Tanner.

70. He was essentially "working for free" as Tanner continued to hold Dr. Oberg responsible for his overhead obligations while simultaneously denying him the ability to generate enough income to be paid.

71. Coupled with the limitations placed on his ability to practice, which made it impossible to earn a living, Dr. Oberg's isolation from the other partners, allegations that he could not be trusted, and Tanner's repeated encouragement that he retire, Dr. Oberg was left with no choice but to terminate his relationship with Tanner.

72. Dr. Oberg was sixty-four (64) years old when his employment with Tanner ended on June 11, 2025.

73. If Dr. Oberg had not been forced to leave Tanner in the summer of 2025, it would not have been long before he would have qualified, under the Agreement, to have Tanner bear the costs of any "tail" coverage or "prior act" coverage, which is only granted if termination of the Agreement occurs "after age 65."

11

**FIRST CAUSE OF ACTION**
**(Age Discrimination in Violation of the ADEA,**
**29 U.S.C. § 621, *et seq.*)**

74.     Dr. Oberg realleges and incorporates the allegations set forth in the previous paragraphs of this Complaint as if fully set forth herein.

75.     During the relevant time frame, Tanner was an entity engaged in an industry affecting commerce that has twenty (20) or more employees for each working day in each of twenty (20) or more calendar week in the current or preceding calendar year and accordingly meets the definition of an "employer" under the ADEA. *See* 29 U.S.C. § 630(b).

76.     During the relevant time frame, Dr. Oberg was an "employee" of Tanner as that term is defined in the ADEA. *See id.* § 630(f).

77.     During the relevant time frame, Dr. Oberg was a protected individual within the meaning of the ADEA in that he was over forty (40) years of age at the time he was subjected to the adverse actions set forth herein. *See id.* § 631(a).

78.     The ADEA makes it unlawful for an employer:

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;
(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age; or
(3) to reduce the wage rate of any employee in order to comply with this chapter.

*Id.* § 623(a).

79.     Tanner discriminated against Dr. Oberg because of his age.

80.     This discrimination was pervasive. It impacted Dr. Oberg's terms, conditions, and privileges of employment, deprived him of opportunities previously available to him, created a hostile work environment, and negatively impacted his compensation such that it became

12

4938-3011-7047, v. 1

impossible for Dr. Oberg to cover his overhead costs or earn a living, culminating in the constructive termination of his employment.

81.     Tanner's decisions to keep Dr. Oberg isolated from the other partners in order to give his office to a younger surgeon, replacing Dr. Oberg's position on the call schedule with a younger surgeon, manufacturing pretextual after-the fact complaints about Dr. Oberg to justify its refusal to place him on the call schedule, reducing his share of referrals by 50%, encouraging him to "retire," threatening to terminate his employment, refusing to escalate his concerns to the Board, and leaving Dr. Oberg with no choice but to terminate his relationship with Tanner, were all motivated by Dr. Oberg's age.

82.     Tanner was further motivated to discriminate against Dr. Oberg based on his age because, if it could force him to retire at age 64, Tanner would not have to bear the costs of any "tail" coverage or "prior act" coverage, which Tanner would have to cover if the Agreement was terminated after Dr. Oberg reached the age of 65.

83.     Tanner's treatment of Dr. Oberg, specifically the actions that forced him to terminate his employment and the decision to replace him with a younger surgeon, was not based on objective, job-related criteria; rather, it was based on his age.

84.     Tanner's stated reasons for its decision to not place Dr. Oberg on the call schedule and to reduce his share of referrals—including that the schedule was already set, that the Board did not have authority over the schedule, statements that there were "continued issues with interactions" between Dr. Oberg and his partners and they no longer trusted him—were false, shifting, contradictory, and pretextual and were inconsistent the Dr. Oberg's exemplary performance history, Tanner's statements that Dr. Oberg provided "quality care," is a "valued partner in the department" and that "his involvement in call coverage is critical" to Tanner

4938-3011-7047, v. 1

"moving forward," and McKinnon's statements that the Department was conveying "unified support" for Dr. Oberg.

85.    The unlawful employment practices of Tanner, specifically the actions described herein, were intentional.

86.    Tanner's unlawful employment practices were done with malice and/or reckless indifference to Dr. Oberg's protected rights.

87.    WHEREFORE, Dr. Oberg is entitled to back pay, front pay, compensatory damages, and punitive damages, in an amount to be determined at trial, in addition to equitable relief, plus pre- and post-judgment interest, and attorneys' fees and costs as allowed by law.

<div align="center">

**SECOND CAUSE OF ACTION**
**(Retaliation in Violation of the ADEA,**
**29 U.S.C.  . § 621, *et seq.*)**

</div>

88.    Dr. Oberg realleges and incorporates the allegations set forth in the previous paragraphs of this Complaint as if fully set forth herein.

89.    During the relevant time frame, Tanner was an entity engaged in an industry affecting commerce that has twenty (20) or more employees for each working day in each of twenty (2) or more calendar week in the current or preceding calendar year and accordingly meets the definition of an "employer" under the ADEA. *See* 29 U.S.C. § 630(b).

90.    During the relevant time frame, Dr. Oberg was an "employee" of Tanner as that term is defined in the ADEA. *See id.* § 630(f).

91.    During the relevant time frame, Dr. Oberg was a protected individual within the meaning of the ADEA in that he was over forty (40) years of age at the time he was subjected to the adverse actions set forth herein. *See id.* § 631(a).

92.    The ADEA makes it unlawful for an employer to retaliate against an employee who has "opposed any practice made unlawful" by the ADEA, "or because such individual . . .

<div align="center">14</div>

has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation" under the ADEA. *Id.* § 623(d).

93.     Dr. Oberg participated in protected activity under federal law when he raised objections directly to McKinnon and members of Tanner's administration in November of 2024 regarding Tanner's treatment of him, specifically, when he expressed concerns that he was being discriminated against because of his age.

94.     In response to Dr. Oberg's protected activities, Tanner subjected Dr. Oberg to adverse employment actions by, among other things, responding with a direct threat that it could terminate his employment at any time, refusing to escalate his concerns of discrimination to Tanner's Board or to provide him any semblance of due process as required by the Agreement, lying about the Board's ability to control his schedule, encouraging him to retire, and leaving Dr. Oberg with no choice but to terminate his employment.

95.     The adverse actions suffered by Dr. Oberg were caused by Tanner in direct response to Dr. Oberg's protected activities.

96.     Dr. Oberg has suffered damages as a result of the aforementioned actions of Tanner in an amount to be proven at trial.

97.     WHEREFORE, Dr. Oberg is entitled to back pay, front pay, compensatory damages, and punitive damages, in an amount to be determined at trial, in addition to equitable relief, plus pre- and post-judgment interest, and attorneys' fees and costs as allowed by law.

<div align="center">

**THIRD CAUSE OF ACTION**
**(Breach of Contract)**

</div>

98.     Dr. Oberg realleges and incorporates the allegations set forth in the previous paragraphs of this Complaint as if fully set forth herein.

<div align="center">15</div>

99.     Dr. Oberg fulfilled all contractual obligations that he owed to Tanner pursuant to the Agreement.

100.    Regarding the scope of Dr. Oberg's employment, the Agreement provides:

Each clinical service department will establish the standards that will constitute full working time for the department. [Dr. Oberg] shall also participate in reasonable schedule of "on call" coverage with other [Tanner] employees as determined by the [Dr. Oberg's] clinical service department. However, the Board of Directors shall, under all circumstances, have ultimate authority over [Dr. Oberg's] schedule and duties.

*See* Ex. A, Sec. 3.

101.    The Agreement required that Dr. Oberg participate in "reasonable" schedule of "on call" coverage. However, Tanner failed to comply with this requirement by refusing to place Dr. Oberg on the call schedule.

102.    Dr. Oberg's schedule was not "reasonable" because the restrictions placed on him by the Department and Tanner prevented him from meeting his overhead obligations; thus, Dr. Oberg was essentially working for free.

103.    To prevent discriminatory actions, such as removing Dr. Oberg from the on-call schedule without justification, the Agreement provided the Board with "ultimate authority" over the schedule. Yet, when Dr. Oberg asked the Board to review the matter, the Board denied possessing such authority.

104.    Tanner thus breached both the spirit and express language of the Agreement by failing to provide Dr. Oberg with an opportunity to present the Department's decision to the Board, including his complaints of age discrimination, and failing to provide the Board with objective, unbiased information regarding the Department's decision to ban Dr. Oberg from the call schedule. These breaches negated the Board's ability to exercise "ultimate authority" over Dr. Oberg's schedule and duties, which would have allowed him to retain his position at Tanner.

16

105.    By forcing Dr. Oberg to terminate his employment in June 2025, Tanner prevented him from being able to take advantage of certain benefits he had bargained for under the Agreement. In particular, this forced Dr. Oberg to be responsible for purchasing any "tail" or "prior acts" coverage, even though, if he had been able to remain at Tanner for a little bit longer, Tanner would have been required, under the Agreement, to bear the costs of this coverage.

106.    As a direct and proximate result of Tanner's material breaches of the Agreement, Dr. Oberg has suffered injury and damages in an amount to be determined at trial.

107.    WHEREFORE, Dr. Oberg is entitled to entry of judgment against Tanner in an amount to be proven at trial, plus pre- and post-judgment interest, plus all of Dr. Oberg's reasonable attorneys' fees and costs pursuant to Utah Code § 78B-5-826 and provisions of the Agreement that pertain to attorneys' fees.

<div align="center">

**FOURTH CAUSE OF ACTION**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

</div>

108.    Dr. Oberg realleges and incorporates the allegations set forth in the previous paragraphs of this Complaint as if fully set forth herein.

109.    An implied covenant of good faith and fair dealing inheres in every contract, including the Agreement.

110.    Tanner had a duty, without limitation, to refrain from taking any action to impede Dr. Oberg's ability to receive the benefits for which he bargained under the parties' agreement.

111.    As more particularly described above, Tanner materially breached its duty of good faith and fair dealing, by, among other things, failing to provide Dr. Oberg with an opportunity to present the Department's decision to the Board, including his complaints of age discrimination, and failing to provide the Board with objective, unbiased information regarding the Department's decision to ban Dr. Oberg from the call schedule. These breaches negated the Board's ability to

<div align="center">17</div>

4938-3011-7047, v. 1

exercise "ultimate authority" over Dr. Oberg's schedule and duties, which would have allowed him to retain his position at Tanner.

112. As a direct and proximate result of Tanner's breach of its duty of good faith and fair dealing, Dr. Oberg has suffered injury and damages in an amount to be determined at trial.

113. WHEREFORE, Dr. Oberg is entitled to entry of judgment against Tanner in an amount to be proven at trial, plus pre- and post-judgment interest, plus all of Dr. Oberg's reasonable attorneys' fees, costs, and expenses.

## DEMAND FOR JURY TRIAL

Dr. Oberg requests that this matter be tried before a jury.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Oberg respectfully requests judgment against Defendant, as follows:

A. For Judgment on all claims and causes of action against Defendant asserted herein;

B. For an award of all economic and non-economic damages caused by Defendant's conduct, including compensatory damages, including the loss of income, both pecuniary and non-pecuniary, in an amount to be determined at trial, as applicable, plus interest;

C. For an award of punitive damages in an amount to be determined at trial;

D. For an award of pre-judgment and post-judgment interest as allowed by law, as applicable;

E. For an award of all of Plaintiff's attorneys' fees and costs of suit, including all costs and expenses incurred through the collection of judgment;

F. For an award of equitable relief in an amount to be determined at trial; and

4938-3011-7047, v. 1

G.     For an award of any other legal or equitable relief as the court deems just and proper.

DATED:  June 23, 2026.

<div align="center" style="margin-left:40%">

**COHNE KINGHORN, P.C.**

/s/ *Stephen T. Hester*
Lisa R. Petersen
Stephen T. Hester
Jessie E. Dyer
*Attorneys for Plaintiff*

</div>

19

4938-3011-7047, v. 1